**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| Richard Michael Tench and | ) | |
| Cynthia Merritt Tench, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | **Jury Trial Demanded** |
| | ) | |
| Kevin J. Azzara, | ) | |
| Greenville County, and | ) | |
| Greenville County Sheriff's Office, | ) | |
| | ) | |
| Defendants. | ) | |

The plaintiffs, by and through their attorney Beattie B. Ashmore, complain against the defendants, and hereby allege and state the following:

**INTRODUCTION**

1.     In the early morning of June 14, 2019, Deputy J. Kevin Azzara ("Azzara") with the Greenville County Sheriff's Office shot Plaintiff Richard Tench ("Mr. Tench") inside Mr. Tench's own home through a windowpane next to the front door. (See attached and incorporated **Exhibit A – Body Camera Screen-Shot of Azzara shooting through the window of Tench's Home**).



2.     Azzara never identified himself as law enforcement prior to shooting Mr. Tench.

3.      That night and in the days and weeks following the shooting, the Greenville County Sheriff's Office ("GCSO") lied to the public, posting on its Facebook page that Azzara "went to the door and soon after was met by the homeowner [Mr. Tench], who pulled the door open and pointed a handgun directly at the deputy." This statement by the GCSO is demonstrably false. (See attached and incorporated **Exhibit B – Excerpt of Screenshot of GCSO's Facebook Post**).



4.      Azzara did not activate his body camera until *after* he shot Mr. Tench. However, as stated by the South Carolina Law Enforcement Division ("SLED"), Azzara's body camera "captured video from thirty seconds before activation." These thirty seconds before activation reveal that Mr. Tench never pulled the door open and pointed a handgun directly at Azzara as the GCSO claimed. Rather, Azzara shot Mr. Tench at an angle through a windowpane next to Mr. Tench's front door, while Mr. Tench was inside his own home.

5.      Mr. Tench has a concealed weapons permit, and while he thought there was an intruder inside his home and he did have a gun in his hand, he never raised it or pointed it at Azzara.

6.      Prior to this incident, while employed by the GCSO, Azzara shot and killed three dogs and one person on separate occasions without any corrective measures taken by the GCSO.

7.    Mr. Tench was shot at least twice. He walks with a limp and one of the bullets will remain permanently lodged in his hip.

8.    Prior to being hired by the GCSO, Azzara was employed by the Township of Waterford, New Jersey. He was terminated in less than a year. He sued the Township of Waterford and the New Jersey Court of Appeals decided in favor of the Township. This information was in the public domain and available to the GCSO before Azzara was hired.

## JURISDICTION AND VENUE

9.    The plaintiffs incorporate by reference all preceding and succeeding paragraphs of this Complaint as if fully set forth herein that are not inconsistent herewith.

10.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

11.   Venue is proper in the District of South Carolina under 28 U.S.C. § 1391.

12.   This case is assignable to the Greenville Division pursuant to Local Civil Rule 3.01.

## PARTIES

13.   The plaintiffs incorporate by reference all preceding and succeeding paragraphs of this Complaint as if fully set forth herein that are not inconsistent herewith.

14.   Plaintiffs Richard Michael Tench and Cynthia Tench ("Mrs. Tench") are natural persons and citizens of the United States of America, residing in Greenville County, South Carolina. Mr. and Mrs. Tench are husband and wife, have been married for years, and they are collectively referred to as "plaintiffs" herein.

15.   GCSO and Greenville County ("employing defendants") are agencies and/or political subdivisions of the State of South Carolina, or some other type of governmental entity, and are sued under State law claims.

16.     The employing defendants are responsible for the actions of all of their respective officers, agents, and employees (hereinafter "employee" or "employees"), including, but not limited to, deputies, dispatchers, and 911 operators, and are sued in their respective representative capacities pursuant to the South Carolina Tort Claims Act, S.C. Code § 15-78-10, *et seq*. The plaintiffs allege that these employing defendants are liable for the acts and omissions of their respective employees' negligence, gross negligence, recklessness, and other liability forming conduct that caused harm to the plaintiffs.

17.     The employing defendants are also sued for their acts and omissions in hiring, training, supervision, retention, and other type(s) of supervisory claims under the South Carolina Tort Claims Act ("SCTCA").

18.     Upon information and belief, defendant Azzara is or was a resident of Greenville County, South Carolina, and was at all times alleged in this Complaint, a deputy, master deputy, and/or employee with one or both of the above-named employing defendants and was at all relevant times acting under color of State law and within the course and scope of his employment with the employing defendant(s).

19.     Azzara is sued in his individual capacity under Federal law. Azzara was at all relevant times acting in the course and scope of his official duties and under color of law.

20.     Azzara is also sued in his personal capacity under the state law claims. Azzara's conduct constituted actual malice and/or intent to harm.

21.     The negligent and grossly negligent acts, omissions, and liability forming conduct of all the defendants includes their agents, principals, employees and/or servants, both directly and vicariously, pursuant to principals of non-delegable duty, apparent authority, agency, ostensible

agency and/or respondeat superior and the acts and/or omissions of the defendants were the direct and proximate cause of the injuries, damages, and losses of the plaintiffs.

## FACTUAL ALLEGATIONS

22.     The plaintiffs incorporate by reference all preceding and succeeding paragraphs of this Complaint as if fully set forth herein that are not inconsistent herewith.

23.     In the late evening of June 13, 2019, an employee of the employing defendant(s) received a call from a caller identifying themselves as "5Star Urgent Response" (hereinafter "5Star"). This call was not placed to 911 emergency services. Rather, upon information and belief, this call was placed to a non-emergency dispatch phone number.

24.     5Star said to the employee that it is "requesting assistance for a subscriber" in Simpsonville, South Carolina, 305 Eastcrest Drive. 5Star stated that it received an "open silent alarm, but there is no answer or call back." The employee asked if the call was "coming from a vehicle or residence or what?" 5Star said it "looks to be, what is it, a panic alarm from a cell phone activation."

25.     After getting off the phone with 5Star, the employee called the cell phone of the 5Star subscriber and left a voicemail asking the subscriber to "give us a call back and let us know if there is an emergency."

26.     Shortly thereafter, an employee stated over the radio to other employees, including sheriff deputies, "having a 10-44 Bravo from 305 Eastcrest Drive." 10-44B is the GCSO 10 Code Signal for "Alarm, Hold-up."

27.     There was no "hold-up" at 305 Eastcrest Drive, and 5Star never said that there was a "hold-up."

28.    Upon information and belief, the employing defendants initially dispatched only one deputy to 305 Eastcrest Drive.

29.    Azzara stated in a written statement that he was at the Quick Trip convenience store on Woodruff Road with Deputy Lollis and Deputy Sheldon having a snack when he (Azzara) was "dispatched to a panic alarm at 305 Eastcrest Drive."

30.    According to Azzara's written statement, after he was dispatched to the alarm, he spoke with Deputy Lollis. Lollis told Azzara that he (Lollis) "was going to head into the office to start end of shift paperwork." Azzara then told Lollis that he "would meet him there to assist as soon as [Azzara] cleared this call and got gas."

31.    When Azzara arrived at the Tench's house, he parked his vehicle at the side of the house, where it was not visible from the front door or any of the front or back windows of the house. The following picture was taken by SLED after the shooting, using a camera flash and/or other light source that depicts the location of Azzara's vehicle relative to the Tench's house. (See attached and incorporated **Exhibit C – SLED Photo Depicting Azzara's Vehicle Relative to Tench's Home**).



32.    Azzara never activated the blue lights or siren on his vehicle while he was at the Tench's house.

33.    In a written statement, Azzara stated that "[a]s I walked up the driveway, I shined my flashlight into the vehicle parked there to make sure it was empty, and it was." Azzara saw nothing amiss with the Tench's vehicle. There was nobody inside of the vehicle, there was no broken glass, and there were no signs of forced entry into the vehicle.

34.    Azzara stated that "[w]hen I walked up to the front door I could not hear or see anybody around."

35.    Azzara did not hear anyone yelling or screaming from the Tench's house. He saw no signs of forced entry into the Tench's house. There was no broken glass, the front porch lights were on, and the front door was intact. Azzara did not see anything amiss when he looked into the Tench's house through the glass windows on the sides of the front door.

36.    Azzara wrote that he "rang the doorbell" and "rocked back and forth" between the windows on the sides of the door, looking inside the Tench's house. Again, nothing was amiss.

37.    At the time, Mrs. Tench was sleeping in an upstairs front bedroom of the house with the window open that was closest to her bed. The plaintiffs' dog slept with her.

38.    Mr. Tench had dozed off in a recliner watching television in a front room on the first floor of their house, adjacent to the foyer. He was using a CPAP machine due to sleeping difficulties. Mr. Tench thought he heard a doorbell and rewound his television program, thinking that the doorbell sound may have come from the television. The below photograph depicts the front of the Tench's house taken by SLED with a camera flash and/or other light source. (See attached and incorporated **Exhibit D – SLED Photo Depicting Front of Tench's Home**).

Mrs. Tench Sleeping
↓



← Mr. Tench dozing off

39.     In his written statement, Azzara stated that after ringing the doorbell, "I then decided that I would check the perimeter of the house to make sure it was secure and see if I could possibly observe anyone through the windows." Again, Azzara saw no signs of forced entry into the Tench's house.

40.     When Mr. Tench rewound his television program, he noticed a light shining into his house. He feared someone was inside his home and he picked up his gun that was next to his recliner and started to walk towards the front foyer. He then turned clockwise and walked towards the back of the house, towards his kitchen.

41.     Azzara's body camera captured Mr. Tench walking toward his kitchen, with his back facing his front door. (See attached and incorporated **Exhibit E – Body Camera Excerpted Screen-Shots of Mr. Tench Walking Away From Front Door**).

Mr. Tench walking away from the front door



42.    While Mr. Tench was walking towards his kitchen with his back to the front door, Azzara shined a bright light through the window. Azzara never announced that he was law enforcement. (See attached and incorporated **Exhibit F – Body Camera Screen-Shot of Azzara Shining Flashlight Through Tench's Window**).



43.      Mr. Tench turned towards the bright light. Azzara's body camera video reveals that Mr. Tench did *not* point his gun at Azzara. It shows that Mr. Tench's arm was at his side. (See attached and incorporated **Exhibit G – Body Camera Screen-Shot of Mr. Tench's Arm at His Side**).



44.      Azzara moved to his left, completely covered by Mr. and Mrs. Tench's house, and pointed his gun into the house through the windowpane. (See attached an incorporated **Exhibit A – Body Camera Screen-Shot of Azzara shooting through the window of Tench's Home**).



45.    Azzara then began shooting blindly through the windowpane and into the Tench's house. Mr. Tench never saw Azzara until after he had been shot. He never raised his gun and therefore had no ability to return fire. Mr. Tench crawled to the front door and unlocked it to allow Azzara into the home. (See attached and incorporated **Exhibit H – Body Camera Screen-Shot of Azzara Shooting into Tench's Home**).



46.    Azzara had substantial time to identify himself as law enforcement and/or announce his presence prior to shooting Mr. Tench.

47.    Azzara did not identify himself as law enforcement or announce his presence at any time prior to shooting Mr. Tench.

48.    Azzara did not activate the blue lights or siren on his vehicle at any time prior to shooting Mr. Tench.

49.    At all times relevant hereto, Mr. Tench was not a suspect of any crime, nor had he committed any crime. Mr. Tench was not under arrest at the time Azzara shot him.

50.    The mere possession of a firearm by a person is not enough to permit the use of deadly force.

51.     Mr. Tench and Mrs. Tench had the constitutionally protected right to occupy their home free from unwarranted interference, searches, and seizure by law enforcement.

52.     An officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon.

53.     Mr. Tench never threatened Azzara or any other person with a weapon.

54.     Mr. Tench's carrying a gun inside his own home, while investigating a nocturnal disturbance on his own property, should have been apparent to Azzara at the time of the shooting.

55.     Moreover, as stated above, Azzara did not identify himself while ringing the plaintiffs' doorbell. Thus, it was unreasonable for Azzara to believe that Mr. Tench's carrying a gun inside his own home was a sign of hostility to law enforcement.

56.     In addition, the time of night and the fact that Mr. Tench had been dozing off also made it more reasonable for him to carry gun inside his own home, which in turn made it less objectively reasonable for Azzara to consider this an act of aggression.

57.     At all times relevant hereto, Mr. Tench had the constitutional right to carry a gun inside his own home.

58.     No reasonable officer could have believed that Mr. Tench was aware that a sheriff deputy was outside his home.

59.     The defendants acted jointly in concert to violate the plaintiffs' constitutional rights and cover-up defendant Azzara's violations of the plaintiffs' constitutional rights.

60.     It was apparent to law enforcement that the cover-up narrative was false, yet they continued to espouse the narrative and failed to report or correct it.

61.     Upon information and belief, numerous Sheriff Deputies were at the scene, and they knew that Azzara shot Mr. Tench through a closed window.

62.     Although it was clear that Mr. Tench never opened his front door armed with a handgun, Deputies Fowler and Holman reported that "[w]hile attempting to investigate, a male subject opened the front door of the residence armed with a handgun, which resulted in an officer involved shooting." This report was approved by Supervisor May. This report is false. (See attached and incorporated **Exhibit I – Excerpt of Fowler, Holman, and May's Report**).

> On 6/13/2019 dispatch received a hold up/duress/panic alarm call at 305 Eastcrest Drive Simpsonville, SC 29681 in Greenville County, South Carolina. Call notes state the panic alarm came from a cell phone ▮▮▮▮▮▮ and is registered to Patricia Merritt. Per dispatch there was no answer for that number on call back. MD K. Azzara (E15) responded to the call for service. while attempting to investigate, a male subject opened the front door of the residence armed with a handgun, which resulted in an officer involved shooting. Emergency request for back up and EMS was aired via radio.

63.     Upon information and belief, Deputy Lollis spoke with one or more of the defendants about reporting that Mr. Tench came to the door and presented a gun. Special Agent Charlynn H. Ezzel with SLED reported that Deputy Lollis told her that he (Lollis) "briefed Master deputy (M/D) Holman, on scene, that the male came to the door and presented a gun."

64.     The phrase "presented a gun" means to show a gun in a threatening manner.

65.     Mr. Tench never came to the door and presented a gun at Azzara or anyone else.

66.     One or more of the defendants posted on the GCSO Facebook page, or caused to be posted on GCSO's Facebook page, "[o]nce the first responding deputy arrived on scene, he went to the door and soon after was met by the homeowner, who pulled the door open and pointed a handgun directly at the deputy. The deputy then fired his weapon, striking the subject at least one time." This is false. (See attached and incorporated **Exhibit B – Excerpt of Screenshot of GCSO's Facebook Post**).



67.     The GCSO posted this false narrative on its website on June 14, 2019 at 3:06 am, while Mr. and Mrs. Tench were being unlawfully seized.

68.     The GCSO posted this false narrative on its Facebook page for 45 days.

69.     The defendants further advanced the cover-up by telling SLED the false narrative and/or causing SLED to become aware of this false narrative, and failing to correct the false narrative with SLED or anyone else.

70.     Using the defendants' false narrative, SLED obtained a search warrant for Mr. Tench's blood, a search warrant for Mr. Tench's medical records, and a search warrant for Mr. and Mrs. Tench's house. The search warrant for Mr. Tench's blood and the search warrant for Mr. and Mrs. Tench's house was obtained while Mr. and Mrs. Tench were being unlawfully seized. Upon information and belief, the search warrants were executed while Mr. and Mrs. Tench were being unlawfully seized. The search warrant for Mr. Tench's medical records was obtained on June 19, 2019 and executed on June 26, 2019.

71.     The affidavit in support of search warrant for Mr. Tench's blood stated the following (See attached and incorporated **Exhibit J – Excerpt from Affidavit in Support of Search Warrant for Mr. Tench's Blood**):

**REASON FOR AFFIANT'S BELIEF THAT THE**
**PROPERTY SOUGHT IS ON THE SUBJECT PREMISES**

Affiant states that on June 14, 2019, deputies were dispatched to 305 Eastcrest Drive in Simpsonville in reference to a panic alarm. A deputy attempted to make contact with residents and was met at the front door by a male brandishing a firearm and pointed it at him. The deputy fired his weapon and the male was shot. The deputy administered emergency first aid and the male, Richard Michael Tench, was transported to Greenville Memorial Hospital with gunshot wound(s). Affiant states that the South Carolina Law Enforcement Division was called to investigate the incident and that a sample of blood from Richard Michael Tench for laboratory testing is pertinent and necessary to the criminal investigation.

72.     The affidavit in support of a search warrant for Mr. Tench's medical records stated the following (See attached and incorporated **Exhibit K – Excerpt from Affidavit in Support of Search Warrant for Mr. Tench's Medical Records**):

**REASON FOR AFFIANT'S BELIEF THAT THE PROPERTY**
**SOUGHT IS ON THE SUBJECT PREMISES**

Affiant states that on June 14, 2019, Greenville County deputies were dispatched to 305 Eastcrest Drive in Simpsonville in reference to a panic alarm. A deputy attempted to make contact with residents and was met at the front door by a male, later identified as Richard Michael Tench, brandishing a firearm who pointed it at him. The deputy fired his weapon and the male was shot. The deputy administered emergency first aid and the male was transported to Greenville Memorial Hospital with gunshot wound(s). Affiant states that the South Carolina Law Enforcement Division was called to investigate the incident. Richard Michael Tench's medical records are pertinent and necessary to this criminal investigation.

73.     The affidavit in support of search warrant to search Mr. and Mrs. Tench's house stated the following (See attached and incorporated **Exhibit L – Excerpt from Affidavit in Support of Search Warrant for Tench's House**):

REASON FOR AFFIANT'S BELIEF THAT THE
PROPERTY SOUGHT IS ON THE SUBJECT PREMISES



Affiant states that on June 14, 2019, deputies were dispatched to 305 Eastcrest Drive in Simpsonville in reference to a panic alarm. A deputy attempted to make contact with residents and was met at the front door by a male brandishing a firearm and pointed it at him. The deputy fired his weapon and the male was shot. The deputy administered emergency first aid and the male was transported to Greenville Memorial Hospital with gunshot wound(s). Affiant states that the South Carolina Law Enforcement Division was called to investigate the incident and that a search of the premises is pertinent and necessary to the criminal investigation.

74.     Azzara's shooting of Mr. Tench was his fifth known officer-involved shooting. On March 4, 2017, Azzara shot and killed Joseph Inabinet. On February 25, 2016, Azzara shot and

killed Joseph Inabinet's dog. Azzara also shot and killed a dog on October 5, 2009 and shot a killed

a dog on May 22, 2018. In 2018 the GCSO awarded Azzara with the "Top Trigger" award.

75.     On or about March 25, 2019 -- almost three months before Azzara shot Mr. Tench

-- Joseph Inabinet's family and personal representative ("the Inabinets") filed a Complaint against

GCSO, Greenville County, and deputies whose names were unknown at the time. On April 24,

2019, the Inabinets filed an Amended Complaint, which identifies Azzara as one of the deputies.

(District of South Carolina Case No. 6:19-cv-01501-TMC). The Inabinets alleged, among other

things, that Azzara and the other deputies used excessive force, and that GCSO and Greenville

County were negligent in their hiring, supervision, and retention. Upon information and belief,

Azzara, the GCSO, and the other defendants entered into a settlement agreement with the

Inabinets.

76.     The defendants violated GCSO written policies. By reference to the General Orders

herein, the plaintiffs in no way suggest that the defendants violated only these Orders, policies,

and/or procedures.

77.     General Order 249, Body Worn and In-Car Cameras, states the following:

**WHEN TO USE:**   If equipped, a deputy will utilize a body worn and/or in-car camera upon
arrival at a call for service or upon initiation of any other law enforcement
or investigative encounter between a deputy and a member of the public,
including, but not limited to:

1.     The scene of all violent crimes
2.     All traffic stops
3.     Motor vehicle accident investigation when the parties to the
motor vehicle accident are present
4.     Suspicious person calls
5.     Incidents involving public drunk or public disorderly
conduct
6.     Field contacts
7.     Warrant service
8.     Incidents involving emotionally disturbed persons
9.     Incidents where weapons are present or alleged to be present

      10.     Incidents where an adversarial contact or a potentially adversarial contact may occur

      11.     Incidents where an adversarial contact or a potentially adversarial contact may occur

78.     Upon information and belief, GCSO General Order 249, Body Worn and In-Car Cameras, was in effect on June 13 – June 14, 2019.

79.     Azzara and other officers did not activate their body worn cameras upon arrival at the Tench's house, in violation of GCSO policy. The GCSO Office of Professional Standards found that Azzara violated this policy.

80.     GCSO General Order 249, Body Worn and In-Car Cameras, also states with respect to deactivation of cameras that "… The supervisor will then confirm that the deputy is no longer an active participant and if the deputy has responded with a use of force. If so, while in-view of the camera and without engaging in further questioning of the deputy, the supervisor will relieve the deputy of duty and deactivate the cameras …" Azzara, other officers, and supervisor(s) violated GCSO General Order 249.

81.     GCSO General Order 205, Response to Resistance / Aggression, states that "[a] response to resistance/aggression must be appropriate to the situation, using the 'objective reasonableness' standard declared by the U.S. Supreme Court in Graham v. Connor, 490 U.S. 386 (1989)."

82.     Upon information and belief, GCSO General Order 205 was in effect on June 13 – June 14, 2019.

83.     As detailed at length throughout this Complaint, Azzara's shooting of Mr. Tench was not objectively reasonable.

84.     Moreover, General Order 205 provides "**Verbal Warning** – Before using deadly force, the Deputy must provide a verbal warning if the situation and time allow." The situation and

time allowed for Azzara to provide a verbal warning prior to shooting Mr. Tench, yet he failed to do so.

85.    Upon information and belief, the employing defendants do not have a procedure and/or do not train their employees to distinguish a medical alert alarm from other types of alarms. If they do have such training and/or procedure, it was not followed here.

86.    Upon information and belief, the employing defendants do not have a 10-code or other type of dispatch code for a medical alert alarm. If they do have such a code, it was not used here.

87.    Upon information and belief, the employing defendants do not have a policy and/or train law enforcement officers to identify themselves as law enforcement and/or make it apparent to homeowners that they are law enforcement when responding to a call at a home. If they do have such a policy, it was not followed here.

88.     The employing defendants failed to properly hire, train, supervise, and retain law enforcement officers, dispatchers, phone operators, and other employees. Their failure to train amounted to deliberate indifference to the rights of persons with whom the police come into contact, including the plaintiffs here.

89.    As a direct and proximate result of the acts and omissions detailed herein, Mr. and Mrs. Tench suffered significant injuries and damages, and will suffer such injuries and damages in the future, including, but not limited to, physical injury, disfigurement and disability, pain and suffering, emotional and mental distress, and medical expenses. Mr. Tench had one bullet removed from his chest. A second bullet will remain lodged in his hip for the rest of his life. A third bullet grazed his back and was recovered from the staircase.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983, 4th and 14th Amendment Claim for Unlawful Search and Seizure,**
**Excessive Force, and Due Process**
**(As to Defendant Azzara)**

90.     The plaintiffs incorporate by reference all preceding and succeeding paragraphs of this Complaint as if fully set forth herein that are not inconsistent herewith.

91.     Azzara was acting under the color of State law and pursuant to his law enforcement duties at all times relevant hereto.

92.     Azzara, without justification and without the need to do so, used excessive and deadly force and seized Mr. Tench **without** legal justification. Azzara's use of force was clearly excessive and clearly unreasonable. Mr. Tench never threatened Azzara or anyone else, and Mr. Tench did not pose an immediate threat to Azzara or anyone else. Azzara had no reasonable basis to believe Mr. Tench committed a crime or was about to commit a crime. Yet, Azzara, while fully covered and protected by Mr. and Mrs. Tench's house, fired blindly into their house, shooting Mr. Tench, seizing the plaintiffs, and directly and proximately causing Mr. and Mrs. Tench severe injuries and damages.

93.     Azzara had alternate methods of handling the situation existing then and there with Mr. and Mrs. Tench that were less forceful and would not have placed them in any harm or exposure to harm.

94.     By the acts and omissions described in this Complaint, Azzara deprived Mr. and Mrs. Tench of the following clearly-established and well-settled constitutional rights protected by the Fourth and Fourteenth Amendments to the United States Constitution:

a.     The right to be free from excessive and unreasonable force as secured by the Fourth and Fourteenth Amendments;

b.     The right to be free from unreasonable search and seizures as secured by the Fourth and Fourteenth Amendments;

19

c.      The right to be free from the use of unlawful force as secured by the Fourth and Fourteenth Amendments;

d.      The right to be free from unlawful, reckless, deliberately indifferent, and conscience shocking searches and seizures and/or excessive force as secured by the Fourteenth Amendment;

e.      The right to be free from injury and detention without substantive due process and from state created/enhanced danger as secured by the Fourteenth Amendment; and

f.      Other particulars that may be learned in discovery.

95.     As a direct and proximate result, Mr. and Mrs. Tench were injured and are entitled to damages, including legally presumed and special damages, in addition to actual, compensatory, general, and nominal damages. The special damages include, but are not limited to, medical expenses and other physician expenses and repair and replacement to damaged property, including Mr. and Mrs. Tench's home. Mr. Tench suffered physical harm, and was forced to incur medical treatment and bills, both in the past and in the future as well. Both Mr. and Mrs. Tench suffered emotional harm, and mental shock and suffering. They both have and have suffered severe and extreme emotional distress, anxiety, and grief, and other harms and losses. Their injuries include, but are not limited to, physical injury, disfigurement and disability, pain and suffering, emotional and mental distress, and medical expenses, that will continue into the future.

96.     The behavior of Azzara shocks the conscious.

97.     Mr. and Mrs. Tench are entitled to an award of punitive damages. The conduct of Azzara was motivated by evil motive and/or intent, and/or the conduct of Azzara involved reckless or callous indifference to the federally protected rights of others.

98.     Mr. and Mrs. Tench are also entitled reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION
**Negligence and Gross Negligence**
**(As to all Defendants)**

99.    The plaintiffs incorporate by reference all preceding and succeeding paragraphs of this Complaint as if fully set forth herein that are not inconsistent herewith.

100.    The defendants all departed from the duties of care required by law enforcement officers, employees, and the employing defendants that hire, train and employ these officers and other employees and were thereby negligent, careless, grossly negligent, reckless and acted in violation of the duties owed to the plaintiffs in that they committed one or more of the following acts or omissions, any or all of which were departures from the prevailing duties of care:

a.    In failing to ensure the safety, security, freedom and well-being of the plaintiffs;

b.    In failing to appreciate the conditions that existed on June 13 – June 14, 2019;

c.    In failing to adhere to proper procedures, including but not limited to failing to ensure there was sufficient cause to shoot somebody through a window inside their home, identifying themselves as law enforcement when responding to someone's home, reporting and communicating events in an accurate and forthcoming manner, using the proper 10-code and/or other communication means to accurately communicate events to others, determine the nature of the situation of a medical alarm versus a hold up;

d.    In failing to use discretion before and during the shooting and consider other methods available to investigate alarms at homes;

e.    In reporting, or causing to be reported, materially false information, and failing to correct that information;

f.    In failing to make apparent observations that the shooting happened through a window rather than an open front door;

g.    In shooting blindly into a home;

h.    In shooting into a home while fully covered and protected;

i.    In writing and/or filing false law enforcement report(s);

j.      In approving false law enforcement report(s);

k.      In communicating to investigators and others the false narrative described above;

l.      In publishing or causing to be published the false narrative described above;

m.      In acquiescing and refusing to come forward with evidence and information that would incriminate Azzara;

n.      In acquiescing and refusing to come forward to correct the false narrative concerning Mr. Tench; and

o.      Other such acts and omissions that discovery reveals.

101.    As a direct and proximate result, Mr. and Mrs. Tench were injured and are entitled to damages, including legally presumed and special damages, in addition to actual, compensatory, general, and nominal damages. The special damages include, but are not limited to, medical expenses and other physician expenses and repair and replacement to damaged property, including Mr. and Mrs. Tench's home. Mr. Tench suffered physical harm, and was forced to incur medical treatment and bills, both in the past and in the future as well. Both Mr. and Mrs. Tench suffered emotional harm, and mental shock and suffering. They both have and have suffered severe and extreme emotional distress, anxiety, and grief, and other harms and losses. Their injuries include, but are not limited to, physical injury, disfigurement and disability, pain and suffering, emotional and mental distress, and medical expenses, that will continue into the future.

**THIRD CAUSE OF ACTION**
**Negligent and Gross Negligent Hiring, Supervision, Training, and Retention**
**(As to Employing Defendants)**

102.    The plaintiffs incorporate by reference all preceding and succeeding paragraphs of this Complaint as if fully set forth herein that are not inconsistent herewith.

103.    Employing defendants each had a duty to hire competent and fit employees to perform background checks, to require appropriate education, experience, and other qualifications, to properly train employees, to properly supervise employees, and to terminate unfit employees.

104.    The defendants breached their duties to adequately hire, supervise, train, and retain employees and acted in a negligent and grossly negligent and reckless manner as follows:

a.    In failing to ensure that employees complied with procedures regarding the incidents such as those described herein;

b.    In failing to ensure that employees complied with procedures regarding responding to a home at night, including identification of themselves as law enforcement;

c.    In failing to ensure that employees identified and utilized proper communication, including but not limited to 10-codes, for the situation at hand;

d.    In failing to ensure that employees correctly understood the difference in different types of calls to dispatch, for example the difference between a medical alert and a hold up, and ask proper questions to determine the nature of a call;

e.    In failing to ensure that employees accurately reported and communicated information and did so in a forthcoming manner;

f.    In failing to terminate employees who were unfit for their position;

g.    In failing to train law enforcement officers to identify themselves as law enforcement and/or make it apparent to homeowners that they are law enforcement officers when responding to a call at a home; and

g.    In other such ways that discovery reveals.

105.    As a direct and proximate result, Mr. and Mrs. Tench were injured and are entitled to damages, including legally presumed and special damages, in addition to actual, compensatory, general, and nominal damages. The special damages include, but are not limited to, medical expenses and other physician expenses and repair and replacement to damaged property, including Mr. and Mrs. Tench's home. Mr. Tench suffered physical harm, and was forced to incur medical

treatment and bills, both in the past and in the future as well. Both Mr. and Mrs. Tench suffered emotional harm, and mental shock and suffering. They both have and have suffered severe and extreme emotional distress, anxiety, and grief, and other harms and losses. Their injuries include, but are not limited to, physical injury, disfigurement and disability, pain and suffering, emotional and mental distress, and medical expenses, that will continue into the future.

WHEREFORE, the plaintiffs respectfully pray for judgment against the defendants and for damages as stated herein, including compensatory, general, actual, special, nominal and punitive damages, plus pre and post judgment interest, in an amount to be determined by a jury at the trial of this action as well as attorneys' fees and costs, and for such other and further relief as this Court deems just and proper.

**THE PLAINTIFFS HEREBY DEMAND A JURY TRIAL**

**FOR ALL CLAIMS SO TRIABLE HEREIN**

This 22nd day of June, 2020                           Respectfully submitted,
Greenville, South Carolina

                                                     /s/ Beattie B. Ashmore
                                                     Beattie Ashmore, #5215
                                                     650 East Washington Street
                                                     Greenville, South Carolina, 29601
                                                     (864) 467-1001 Office
                                                     (864) 672-1406 Fax
                                                     Beattie@BeattieAshmore.com